**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

David Ruiz,

          Plaintiff,

v.

Frank Kendall,

          Defendant.

No. CV-23-00549-TUC-AMM

**ORDER**

Pending before the Court is Defendant Troy Meink's Motion for Summary Judgment.[1] (Doc. 50.) The motion is fully briefed. (Docs. 50–51, 56–58, 60.) Also pending is Plaintiff David Ruiz's Motion for Partial Summary Judgment. (Doc. 52.) The motion is fully briefed. (Docs. 52–55, 59.) The Court held oral argument on the cross motions for summary judgment on March 4, 2026. (Doc. 64.)

For the following reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment.

## I.    Procedural History

Plaintiff initiated this action on December 6, 2023. (Doc. 1.) Plaintiff subsequently filed an Amended Complaint on May 16, 2024. (Doc. 15 at 11–13.) In Count One, Plaintiff alleges that Defendant (the "Air Force") discriminated against Plaintiff because of his

---

[1] Troy Meink succeeded Frank Kendall as the Secretary of the United States Department of the Air Force. (Doc. 50 at 1.) He is automatically substituted as Defendant in this action pursuant to Federal Rule of Civil Procedure 25(d). The Court will direct the Clerk of Court to amend the caption to reflect this substitution.

disability, and in violation of the Rehabilitation Act, "when it subjected Plaintiff to adverse employment actions including, but not limited to, generally worsening the terms and conditions of his employment, denying his request to convert annual and sick leave to weather and safety leave, and/or by treating him less favorably than similarly situated employees outside his protected class." (*Id.* at 11–12.) In Count Two, Plaintiff alleges that Defendant violated the Rehabilitation Act by failing to provide him with a reasonable accommodation. (*Id.* at 12.)

On July 31, 2025, Defendant filed a Motion for Summary Judgment as to both counts of Plaintiff's Amended Complaint. (Doc. 50.) Plaintiff thereafter filed a Motion for Partial Summary Judgment as to Count Two. (Doc. 52.)

## II.    Undisputed Relevant Facts

Plaintiff worked as a civilian, non-appropriated fund ("NAF") employee at Davis Monthan Air Force Base ("DMAFB") in Tucson, Arizona. (Doc. 51 at 1–3; Doc. 53 at 1.) In 2008, Daniel Baker, the Lodging Manager of an on-base housing facility called "The Inn," promoted Plaintiff to the position of Assistant Lodging Manager and served as Plaintiff's supervisor. (Doc. 51 at 1–3; Doc. 53 at 5.) Plaintiff was the Assistant Lodging Manager until September 30, 2022. (Doc. 53 at 5.)

The job description provides that, among other duties, the Assistant Lodging Manager is responsible for "set[ting] long-range plans, goals, and objectives[,]" "[d]evelop[ing] policies and procedures, which result in competent and effective operation and utilization of all lodging assets[,]" and "[p]repar[ing] budget estimates and controls of disbursement of funds." (*Id.* at 6.) It further explains that Assistant Lodging Manager "[p]erforms or directs periodic or scheduled surveys, audits, and inspections to determine adequacy of lodging conditions, compliance with requirements, and to evaluate effectiveness of financial management/controls." (*Id.*)

Nonetheless, according to Plaintiff, he "strictly did operations." (Doc. 51-14 at 8–10.) He described his job as follows:

> Responsible for all civil engineers, work order requests, tracking of the work order requests, follow-up of the

work order request, responsible for contractors coming on to the base over to the site to do work. Supervised those contractors. I was their escort in and out of the base. Managed a maintenance team. Issued work order tasks for any roommate instances that came up either reported through guests, through housekeeping, through inspections. Followed up and assured that the work tasks were completed. Worked with logistics to ensure that we had all the parts and the supplies that we needed to get these tasks completed.

I was responsible for our fleet, our vehicle fleet, which included some golf carts. I was responsible for a scissor lift for our warehouse, keeping it maintained, keeping the preventative maintenance up to date, replacing batteries as needed.

I was responsible for the two electric pallet jacks that we had up on site. Same thing. Responsible for the preventative maintenance, changing out the batteries, what have you.

I was the safety rep. My responsibility was to make sure that all our personnel was properly trained in safety.

I was the [point of contact] when wing safety would come down and do their annual inspections.

(*Id.* at 8–9.) Plaintiff also averred that he did physical inspections of the premises "[d]aily" and that his duties remained "pretty much the same." (*Id.* at 9–11.)

### a. Plaintiff's Diagnosis and Pre-Pandemic Leave

In 2017, Plaintiff informed Baker that he was diagnosed with chronic ulcerative colitis ("UC"). (Doc. 51 at 3; Doc. 53 at 4.) Plaintiff received treatment for his condition, including infusions that each lasted approximately 5 hours. (Doc. 51-14 at 24.) From 2017 to 2019, Plaintiff requested leave for the full workday on days when he received an infusion, and he requested additional leave on days "when [he] wasn't feeling good" due to his UC. (*Id.* at 25.) Baker approved the requests. (*Id.*)

On March 14, 2019, Plaintiff presented a doctor's note advising that he needed to "leave early from work at 2:30pm as needed due to medical issues from now until

12/31/19." (Doc. 51 at 3.) Based on this doctor's note, from March 15, 2019 to January 6, 2020, Plaintiff submitted leave requests almost daily that used Accrued Annual Leave ("AL") and Accrued Sick Leave ("SL") to leave work early or, sometimes, to be absent from work the entire day. (Doc. 51-1 at 41–55; Docs. 51-2–51-5; Doc. 51-6 at 1–19.) Baker continued to approve Plaintiff's leave requests. (Doc. 51-1 at 41–55; Docs. 51-2–51-5; Doc. 51-6 at 1–19.)

On January 6, 2020, Plaintiff presented another doctor's note advising that he needed "to work from 7:30am–2:30pm Monday through Friday due to medical conditions." (Doc. 51 at 3–4.) Consequently, from January 7, 2020 to March 20, 2020, Plaintiff submitted—and Baker approved—daily leave requests that allowed Plaintiff to leave at approximately 2:30 p.m. or earlier. (Doc. 51-6 at 24–26; Doc. 51-7; Doc. 51-8 at 1–16.) Plaintiff's leave requests during this period used AL, SL, or a combination of both types of leave in a day. (Doc. 51-6 at 24–26; Doc. 51-7; Doc. 51-8 at 1–16.)

### b. Air Force Leave Guidelines During the Pandemic

On March 13, 2020, the Air Force issued NAF-HR Directive 20-010 "Telework and Coronavirus Fact Sheet for [Air Force] NAF Employees." (Doc. 51-8 at 18–24.) The directive stated, in relevant part, that Weather and Safety Leave ("WSL") "may [be] authorize[d] . . . when an asymptomatic employee . . . is subject to movement restrictions (quarantine or isolation) under the direction of public health authorities due to a significant risk of exposure to a quarantinable communicable disease, such as 2019-nCoV."[2] (*Id.* at 20.) It further explained:

> Use of [WSL] would supersede the use of [SL] as would have otherwise been allowed in these circumstances under OPM's [SL] regulations at 5 C.F.R. § 630.401(a)(5).[3] Use of [WSL] would be subject to the normal conditions—for example, [WSL] may be granted only if an employee is not able to

---

[2] WSL is discretionary paid leave that may be granted if an employee "is prevented from safely traveling to or performing work at an approved location . . . ." 5 U.S.C. § 6329c(b).

[3] 5 C.F.R. § 630.401(a)(5) grants SL if an employee "[w]ould, as determined by the health authorities having jurisdiction or by a health care provider, jeopardize the health of others by his or her presence on the job because of exposure to a communicable disease . . . ." 5 C.F.R. § 630.401(a)(5).

safely perform work at an approved location. Thus, an employee who is not a telework program participant would be granted [WSL] for quarantine periods based on potential exposure.

(*Id.*)

Thereafter, on March 17, 2020, the Air Force issued NAF-HR Directive 20-012 "Updated Guidance on Telework Flexibilities" stating:

The guidance encourages agencies to maximize telework flexibilities to eligible workers within the populations that the CDC has identified as being at higher risk for COVID-19 . . . .

Departments and agencies are further encouraged to approve leave for safety reasons to employees who are at higher risk as identified by the CDC and not telework eligible . . . . Agencies may grant employees safety leave under 5 U.S.C. § 6329c(b) at the agencies [sic] discretion.

(*Id.* at 26–27.)

On March 20, 2020, the U.S. Department of Defense ("DOD") issued a memorandum that stated, in relevant part, that WSL "is not an entitlement" and that "approval authority is the commander or head of activity unless further delegated." (Doc. 51 at 5.) There is no dispute that Baker was the head of activity for lodging operations at DMAFB, which never closed during the pandemic. (*Id.*; Doc. 58 at 4.)

On March 30, 2020, the DOD issued another memorandum with a matrix that instructed, in relevant part, that if an employee of an open worksite was directed by a medical professional to stay home, the "duty status options" were telework or WSL. (Doc. 53-1 at 86.) The memorandum also stated, however, that "[e]mployees may telework if they occupy a telework eligible positions and have a telework agreement" and that "[WSL] is not an entitlement." (*Id.*)

### c. Plaintiff's Pandemic Leave

#### 1. March 23, 2020 to April 8, 2020

Upon the start of the pandemic, Plaintiff submitted leave requests for the week of

- 5 -

March 23, 2020 to March 27, 2020 using a combination of AL and SL. (Doc. 51-8 at 51–55; Doc. 51-9 at 1–2.) Baker approved the requests. (Doc. 51-8 at 51–55; Doc. 51-9 at 1–2.) At this time, Plaintiff also began receiving some WSL. (Doc. 51-1 at 25.)

For the week of March 30, 2020 to April 3, 2020, Plaintiff submitted—and Baker approved—leave requests that again used a combination of AL, SL, and WSL. (Doc. 51-9 at 4–7.) Likewise, from April 6, 2020 to April 8, 2020, Plaintiff submitted—and Baker approved—leave requests using a combination of AL, SL, and WSL. (*Id.* at 9–11.)

**2.   April 9, 2020 to September 5, 2020**

On April 9, 2020, Plaintiff presented a doctor's note dated March 30, 2020 that read: "Patient has a compromised immune system due to his health issues. It may be prudent for him to take some time off work to decrease his risk of COVID-19 exposure." (*Id.* at 13.) As a result of this note, Plaintiff did not return to work regularly until May 3, 2021. (Doc. 51 at 6, 11.)

Baker did not discuss teleworking with Plaintiff. (Doc. 51-12 at 17.) On some unspecified date, Baker met with "[t]he commander; deputy commander; human resources; [and] civilian personnel director, [his] boss, Lieutenant Kaiser at the time" to discuss Baker's workload, which included some of Plaintiff's duties while Plaintiff was on leave. (*Id.*) The conversation then became about Plaintiff, and Baker was asked "why [Plaintiff] wasn't teleworking." (*Id.*) Baker "explained that nobody in lodging [was] teleworking, and as far as [he] was concerned, no one could telework to do the job that [they were] supposed to do." (*Id.* at 17–18.)

Plaintiff did not telework and took an extended absence. (Doc. 51 at 6, 11.) Plaintiff submitted—and Baker approved—16 leave requests in the five months between when he submitted his doctor's note on April 9, 2020 and September 5, 2020. (Doc. 51-9 at 15–30.) During this time, Plaintiff requested 1 hour of AL, 2 hours of SL, and 5 hours of WSL per day.[4] (*Id.*) Plaintiff's signature was on each of these leave requests. (*Id.*)

///

---

[4] Except that Plaintiff's leave form for May 20, 2020 used 8 hours of SL. (Doc. 51-9 at 20.)

**3.    September 7, 2020 to March 19, 2021**

Plaintiff inexplicably stopped submitting leave forms on Monday, September 7, 2020. (Doc. 51 at 8.) Rather than designate Plaintiff as Absent Without Leave ("AWOL"), Baker began submitting leave forms on Plaintiff's behalf that mirrored the daily use of 1 hour of AL, 2 hours of SL, and 5 hours of WSL. (Doc. 51-10 at 17–31.) In place of Plaintiff's signature, Baker wrote, "UNABLE TO SIGN DUE TO COVID 19 RESTRICTION." (*Id.*) Baker executed 14 leave forms for Plaintiff from September 6, 2020 to March 19, 2021. (*Id.*)

Although Plaintiff did not personally submit any leave requests for this period, he did submit several doctor's notes to the Air Force. (*Id.* at 33, 35, 37.) The first doctor's note dated October 27, 2020 advised to extend Plaintiff's leave until after his follow up appointment on November 23, 2020. (*Id.* at 33.) On November 23, 2020, the Air Force received another doctor's note asking to extend Plaintiff's leave again until his appointment on January 11, 2021. (*Id.* at 35.) Finally, on January 4, 2021, the Air Force received a doctor's note "strongly recommending that [Plaintiff] stays off work until 2/1/2021 due to worsening autoimmune disease and also the record number of COVID-19 cases." (*Id.* at 37.) It further stated that Plaintiff "is at very high risk of contracting and dying from COVID-19 if he is infected." (*Id.*)

Plaintiff also communicated directly with DMAFB officials during this period. (Doc. 51-1 at 16–17.) On December 9, 2020, Plaintiff emailed Baker; Ann Ulibarri, Human Resources Officer; Gokcan Hart, Civil Personnel Officer; and Lisa Chamberlain, Chief of Finance. (*Id.*; Doc. 51 at 9.) Plaintiff detailed his medical condition prior to the pandemic, saying that "Mr. Baker has been supportive and I used sick and annual leave when I request to be excused from work." [5] (Doc. 51-1 at 17.) Plaintiff then explained that "[his] doctor said avoid work and protect [him]self" when the pandemic began. (*Id.*) Plaintiff then wrote, in relevant part:

---

[5] It is not clear why Baker did not inquire whether Plaintiff intended to continue using leave if Baker was in touch with Plaintiff in December 2020 via this email. It also is not clear what happened as a result of this email.

I had a talk with Mr. Baker about this and again he was supportive and with a doctor's note and the original guidelines that came out I was covered. Of course this was all new to all of us so there was some bumps early on on what was allowed and what wasn't. Once these bumps got ironed out I was okayed for what we now call Weather and Safety leave.

The only thing that was talked about with Mr. Baker and myself was that I would be required to continue to use Sick and Annual leave because that's what I was doing prior to this horrible Covid . . . . I had no issues because I had a lot of both and didn't in my wildest dreams think we still be dealing with this.

This was a concern because now I had a question about my leave balance. It then when it came to the fore front that I shouldn't have been getting charged any leave during this time unless it was for medical appointments or any scheduled annual leave . . . .

The target date to return is January 11, 2021. I understand that Weather and Safety leave expires on December 31, 2020. If I can get a balance of my sick and annual leave I will request the additional time.

(*Id.* at 17–18.)

In her deposition, Ulibarri stated that, after this email, she "[d]iscussed with Mr. Baker if he was looking into reasonable accommodations to bring [Plaintiff] back to work and keep him safe." (Doc. 53-2 at 54.) Ulibarri said she "[j]ust [gave] him the options on what he could do to have [Plaintiff] come to work and still work basically." (*Id.*) The options were "[t]elework, have him work in an office, enclosed office by himself while he was at work, minimize his contact with people, wear a mask . . . ." (*Id.* at 55.) In the discussion, Baker responded that "[h]aving him work back in the building was sufficient . . . because [Plaintiff] needed to be present . . . ." (*Id.*) Ulibarri clarified that she only suggested those as options to Baker and she did not know or recall Baker's response. (*Id.*) Ulibarri stated that, if any options were to be presented to Plaintiff, it would have been Baker's role to do so, but she did not know if any such conversation happened between

Baker and Plaintiff. (*Id.* at 56.)

On December 18, 2020, Ulibarri sent an email to several supervisors, including Baker, stating that the Air Force was ending WSL on December 31, 2020. (Doc. 53-3 at 65–66.) Nonetheless, on January 4, 2021, Baker told Ulibarri that he received a doctor's note extending Plaintiff's leave until February 1, 2021. (*Id.* at 65.) When Baker asked whether he was permitted to grant Plaintiff additional WSL after December 31, 2020, Ulibarri confirmed that Plaintiff was still eligible for WSL based on his most recent doctor's note. (*Id.* at 64–65.) Ulibarri also explained to Baker:

> In the meantime, you should consider discussing with [Plaintiff] whether he needs any flexibilities or reasonable accommodation to return to the workplace at the expiration of his Drs note, i.e. telework, social distancing by minimizing his contact with people, limit his in-person contact with people, provide masks, face shield, hand sanitizer, gloves, Lysol, etc. Please let me know if you would like to explore the reasonable accommodations process.

(*Id.* at 64.) Baker forwarded the email to Plaintiff on January 7, 2021 informing Plaintiff that he was "eligible to continue using WSL based upon [his] Doctor's excuse." (*Id.* at 63.)

On January 26, 2021, Baker again wrote Ulibarri, stating:

> I have been very supportive and patient with the medical situation we find ourselves in with [Plaintiff]. It is very unfortunate that [Plaintiff's] medical condition has not improved with several different treatment plans and the current Pandemic. He has not been able to work since March 2020 due to his compromised immune system/illness/COVID 19. Also, [he has been] unable to completely perform his daily duties since April 2018 working only partial days (33%) due [to] his illness. I am requesting a fit for duty examination to determine his long term ability to perform his assigned duties here at lodging. Lodging has always been open (24/7) and has never reduced/limited hours even during the pandemic, there's no ability to perform teleworking and we have major concerns with providing safe reasonable accommodations in the work place.

(Doc. 53-2 at 33.)

On January 27, 2021, Baker directed Plaintiff to undergo a medical examination, stating in a memorandum that Baker was "concerned about [Plaintiff's] current medical condition, which has prevented [him] from performing the full range of the duties of [his] permanently assigned position as Assistant Lodging Manager." (Doc. 51-10 at 43.)

On February 2, 2021, Plaintiff's doctor conducted the examination and concluded that Plaintiff was "medical qualified – if restrictions [were] accommodated" including "allow[ing] [Plaintiff] to work from home to avoid exposure to Covid." (*Id.* at 46.) However, on March 1, 2021, Plaintiff's doctor faxed a note recommending that Plaintiff "wait to return to work in person until he receives the COVID-19 vaccine." (Doc. 53-1 at 34.) The note further stated that Plaintiff would "need the two-shot vaccine series[.]" (*Id.*) There is no indication that Plaintiff received the vaccine.

### d. Plaintiff Ordered to Return to Work

On March 19, 2021, Baker emailed Plaintiff notifying him that he was "required to report back to work on Monday, 22 March 2021 at 0800 hrs." (*Id.* at 49.) To reduce Plaintiff's exposure to COVID-19, Baker outlined certain accommodations including a private office, face mask, face shield, and disinfecting cleaners.[6] (*Id.*) Baker notified Plaintiff that if he did not report as required, he would be marked AWOL. (*Id.*)

Plaintiff did not return to work on March 22, 2021. (*Id.* at 51.) Instead, he submitted a leave form requesting 16 hours of SL for March 22, 2021 and March 23, 2021 because his father was in the hospital. (*Id.*) Baker approved the request. (*Id.*)

Plaintiff returned to work on March 24, 2021 and worked a full day in person. (Doc. 51 at 10.) The next day, Plaintiff submitted a request to use AL to leave at 2:00 p.m. because he was not feeling well after a treatment for his UC. (Doc. 51-10 at 52.) Plaintiff indicated on the form that the requested leave was "NOT COVID related." (*Id.*) Baker approved the request. (*Id.*) The following day, on March 26, 2021, Plaintiff submitted—and Baker approved—a request to use 8 hours of SL because his father was again in the hospital. (*Id.*

---

[6] As addressed *infra*, Defendant asserts that the essential functions of Plaintiff's position were in-person and could not be accomplished via telework. (Doc. 50 at 12–13; Doc. 54 at 10; Doc. 60 at 2.)

at 53.)

Plaintiff then submitted a leave form requesting 40 hours of SL for the week of March 29, 2021 to April 2, 2021. (*Id.* at 54.) The remarks stated that Plaintiff had a "[f]ollow up with GI Specialist." (*Id.*) Baker approved the request. (*Id.*)

On March 29, 2021, the Air Force received a doctor's note stating Plaintiff was not permitted to return to work until May 3, 2021. (*Id.* at 56.) Baker approved SL for Plaintiff through April 30, 2021. (Doc. 51 at 11.)

Plaintiff returned to work on May 3, 2021. (*Id.*)

### e. Plaintiff Requests Retroactive Leave Conversion

At some point after his return to work, Plaintiff requested that his used AL and SL from September 6, 2020 to May 1, 2021 be retroactively converted to WSL.[7] (*See id.* at 12; Doc. 51-20 at 5; Doc. 51-21 at 5; Doc. 57 at 3–4; Doc. 57-1 at 73–74, 80, 171.) Baker's supervisors informed him that "Air Force San Antonio and legal" were "putting a package together" and "trying to get [Plaintiff's] leave back." (Doc. 57-1 at 171.) Baker relayed this information to Plaintiff. (*Id.*)

On October 12, 2021, NAF Financial Analyst ("NAFFA") Alicia Solorio issued a memorandum regarding a "Special Review of Lodging Leave Records." (Doc. 51-20 at 5.)

---

[7] It is unclear when and how Plaintiff first made this request. It is also unclear why Plaintiff selected these specific dates. Plaintiff argues that he is entitled to convert his AL and SL because Defendant failed to engage in the interactive process as soon as it learned that Plaintiff could not work a full 8-hour day because of his disability. (Doc. 56 at 11.) However, Plaintiff only seeks conversion of leave used from September 6, 2020 to May 1, 2021. Puzzlingly, this timeframe does not start on January 6, 2020 when Plaintiff first submitted his doctor's note informing Defendant that he could not work a full day because of his disability. Nor does he seek conversion of the AL and SL that he personally requested from April 9, 2020 to September 5, 2020 after he submitted a third doctor's note informing Defendant of his disability-related need to take time off work, which, by Plaintiff's argument, would also trigger the duty to engage in the interactive process. The Court, therefore, can only assume that Plaintiff targets the period between September 6, 2020 and May 1, 2021 because September 6, 2020 is when Baker began submitting leave requests on Plaintiff's behalf. However, to the extent that Plaintiff seeks relief only for the leave that he did not personally request, it remains unclear why he then includes leave used *after* March 19, 2021 when Baker stopped submitting Plaintiff's leave forms and Plaintiff resumed submitting them himself.

She stated in part that "[a]t the request of the FSS Resource Management Flight Chief, from 22 Sep – 12 Oct 2021, the NAFFA conducted a special review of Lodging leave records from 1 Sep 20 through 8 May 21. The NAFFA conducted a review of one employee (Employee A) specifically and five other employees (randomly selected)."[8] (*Id.*) Solorio wrote that her "understanding is Employee A has requested converting annual and sick leave from 6 Sep 20 – 3 May 21 to WSL. This is approximately 615+ hours . . . valued at approximately $21K." (*Id.*)

Although Solorio noted that Plaintiff did not sign most of the leave forms from September 6, 2020 to May 1, 2021, she nonetheless recommended that Plaintiff's "leave hours not be converted to WSL." (*Id.*) Solorio reasoned that (1) Plaintiff never requested 8 hours of WSL; (2) Plaintiff used an average of 3 hours of AL and SL per day for the 6 months before the pandemic; (3) Plaintiff never provided a doctor's note that stated he could return to a full workday; (4) at the start of the pandemic around "13 Apr 20, [Plaintiff] had no regular hours and had a clear history of 1 hour [AL], 2 hours [SL] [,] and 5 hours WSL"; and (5) "[i]f [Plaintiff] is claiming he did not request leave between 6 Sep 20 – 1 May 21 and this leave was approved without his consent, then he should be considered AWOL." (*Id.* at 5–6.)

Around November 2021, Plaintiff and Baker met and discussed Plaintiff's leave during the pandemic. (Doc. 51 at 12.) In his deposition, Plaintiff averred that Baker told him, "Yeah, I think there was a mistake. Yeah, don't worry about it. We're going to take care of it. We're going to restore it." (Doc. 51-16 at 5.) However, according to Baker's deposition, he "didn't make a mistake" and instead "did what [he] understood the guidance provided to [him], coordinated through payroll, coordinated through HR, that [he] was doing the right thing." (Doc. 51-13 at 16.)

After his meeting with Plaintiff, Baker sought guidance from his superior, Lt. Col. Terrell Tillery. (Doc. 51 at 12; Doc. 51-1 at 10.) It is not clear what Baker specifically asked Lt. Col. Tillery or what Lt. Col. Tillery did with that information. (Doc. 51-1 at 10;

---

[8] Plaintiff avows without objection that he is Employee A. (Doc. 57 at 4.)

- 12 -

Doc. 58 at 9.)

On March 16, 2022, NAF Human Resources Officer Khalilah Huddleston wrote a memorandum titled "Special Audit – David Ruiz."[9] (Doc. 57-1 at 80.) Huddleston recommended crediting back to Plaintiff 127 hours of AL and 406 hours of SL and retroactively converting those 533 hours to WSL. (*Id.*) These hours account for the AL and SL that Baker requested on Plaintiff's behalf in leave forms covering the period from September 6, 2020 to March 19, 2021. (*Id.*)

Huddleston stated that her recommendation was "based on the fact[] that although Mr. Baker knew the process regarding the receipt and approval of the [leave forms] [,] he did not follow them." (*Id.*) Specifically, Baker submitted leave forms without Plaintiff's signature. (*Id.*) Huddleston further commented that the March 30, 2020 Air Force guidelines for COVID-19 stated, "if an employee is directed by a medical professional . . . to stay home[,] and the employee i[s] telework ineligible[,] then WSL applies." (*Id.*) Huddleston explained that Baker said telework was not available for lodging operations. (*Id.*) Finally, Huddleston opined that Plaintiff's position as Assistant Lodging Manager "does contain a majority of duties that are primarily administrative in nature which would have enabled him to telework." (*Id.* at 81.)

Ultimately, Huddleston found that Plaintiff should have been granted 533 hours of WSL because he was instructed to stay home by a medical professional and, per Baker's statement, lodging did not offer telework. (*Id.*)

On July 22, 2022, Wilma Hall, Operations Branch Chief for the Air Force Services Center ("AFSVC"), told Huddleston that she disagreed with Huddleston's recommendation and agreed instead with Solorio's recommendation to deny Plaintiff's conversion request. (Doc. 51-10 at 61.)

Although Baker obtained recommendations, it was ultimately his decision as the first line supervisor whether to grant Plaintiff's request for leave conversion. (*Id.* at 59–60; Doc. 51 at 13.) On August 2, 2022, Huddleston instructed Baker to communicate his

---

[9] It is not clear what triggered Huddleston to conduct her review.

official decision to deny Plaintiff's conversion request in writing. (Doc. 51-10 at 58.)

On August 5, 2022, Baker wrote a memorandum to Plaintiff that stated in full: "Request for Annual and Sick leave to be restored and credited to Weather and Safety Leave is disapproved. Request was reviewed/coordinated with Davis Monthan Human Resources, [355th Force Support Squadron]/Leadership, AF Lodging and AFSVC/VBLO." (*Id.* at 63.) Plaintiff acknowledged receipt of the memorandum decision via his signature on August 5, 2022. (*Id.*)

### f.    Plaintiff Appeals Through the Administrative Grievance Process

DMAFB has a three-step administrative grievance process whereby employees can request review of supervisor decisions. (Doc. 51-21 at 2.) Step One requires a written grievance. (*Id.*) If the employee is not satisfied with the reviewing supervisor's decision at Step One, the employee may submit a written grievance "to the next, higher level supervisor (at Step Two)." (*Id.*) The employee may repeat this process once more at Step Three. (*Id.*)

On August 22, 2022, Plaintiff filed a grievance at Step One regarding "the disapproval of returning 127 hours of annual and 406 hours of sick leave from the period of April 2020 thru May of 2021 for a total of 533 hours with no explanation issued on Friday August 5, 2022." (*Id.* at 5.) Plaintiff claimed that "NAF HR had made a recommendation that [his] leave be restored based on there wasn't any SF71 leave forms with [his] signature authorizing deduction of annual and sick leave for the periods mentioned." (*Id.*)

Baker's supervisor, Capt. Michael Asuncion, reviewed and denied Plaintiff's Step One grievance. (*Id.* at 2–3.) In so doing, Capt. Asuncion considered Plaintiff's use of AL and SL before the pandemic to cover 3 hours of the workday, and he considered Solorio's recommendation to deny leave conversion. (*Id.* at 3.)

On September 14, 2022, Plaintiff submitted a Step Two grievance. (Doc. 51-23 at 5.) Lt. Col. Tillery denied the request at Step Two. (*Id.* at 2–3.) In so doing, Lt. Col. Tillery also considered Plaintiff's use of AL and SL before the pandemic as well as Solorio's recommendation. (*Id.* at 3.) However, Lt. Col. Tillery offered to return the AL and SL to

Plaintiff "and substitute Absence Without Leave ('AWOL') in its place, since Plaintiff was contending that he had no agreement with Mr. Baker regarding his leave use while he was absent from work during that timeframe." (*Id.*)

On November 1, 2022, Plaintiff submitted a final grievance at Step Three. (Doc. 51-25 at 5.) On November 8, 2022, Col. Casey Bartholomew denied the request at Step Three. (*Id.* at 2–3.) Col. Bartholomew considered Plaintiff's use of AL and SL before the pandemic and considered Solorio's recommendation. (*Id.* at 3.) He also offered to return the leave and substitute AWOL. (*Id.*) There is no indication that Plaintiff responded to either offer to convert his leave to AWOL.

### g. Plaintiff Complains Through the Equal Employment Opportunity Process

On November 16, 2022, Plaintiff contacted Equal Employment Opportunity ("EEO") Director Ricky Collins. (Doc. 51-26 at 2, 5.) On December 15, 2022, Plaintiff filed an Informal EEO Complaint against Baker. (*Id.* at 5.) The "Civilian Pre-Complaint Intake Form" stated that Plaintiff's "Claim Type" was "Other: Not restoring leave for disability (c[h]ronic ulcerative colitis)." (*Id.* at 6.) Plaintiff marked the incident date as November 2, 2022, although Plaintiff could not explain in his deposition why he chose November 2, 2022. (*Id.*; Doc. 51 at 15.)

In his "Narrative of the Incident," Plaintiff wrote: "Wouldn't restore leave taken with no authorization." (Doc. 51-26 at 7.) Plaintiff stated that the issue was: "Whether the complainant, Mr. David Ruiz[,] was discriminated against based on disability, Chronic Ultracolitis [sic] (physical) when on 2 November 2022, Mr. Dan Baker, Lodging Manager, 355 FSS/FSVL, did not reinstate 127 hours of Annual Leave and 406 hours of Sick Leave."[10] (*Id.* at 10.)

On January 23, 2023, Plaintiff filed a Formal EEO Complaint. (*Id.* at 12–13.) He

---

[10] Plaintiff did not specify the date range the for these hours in his Informal EEO Complaint, but these are the exact amounts of leave addressed by Huddleston that covered the period from September 6, 2020 to March 19, 2021 when Baker submitted leave forms on Plaintiff's behalf. (Doc. 57-1 at 80.)

alleged that Baker, Capt. Asuncion, Lt. Col. Tillery, and Col. Bartholomew discriminated against him based on disability. (*Id.* at 12.) Plaintiff articulated the issue as follows:

> Whether Complainant David Ruiz was discriminated against based on his disability, Chronic Ulcerative Colitis (physical) when:
>
> 1. On or about 5 August 2022, Lodging Manager Don [sic] Baker, 355 FSS/FSVL, denied my request to reinstate 127 hours of Annual Leave; and
>
> 2. On or about 5 August 2022, Lodging Manager Don [sic] Baker, 355 FSS/FSVL, denied my request to reinstate 406 hours of Sick Leave; and
>
> 3. On or about 8 November 2022, Col. Casey J. Bartholomew denied my Step 3 Grievance seeking reinstatement of 127 hours of Annual Leave and 406 hours of Sick Leave.

(*Id.*)

On February 3, 2023, EEO Director Collins issued a "Notice of Acceptance of Formal EEO Complaint" notifying Plaintiff that the 355th Wing Equal Opportunity Office at DMAFB would investigate his claim of:

> Whether the complainant, Mr. David Ruiz[,] was discriminated against based on disability, Chronic Ultracolitis [sic] (physical) when on 2 November 2022, Mr. Dan Baker, Lodging Manager, 355 FSS/FSVL, did not reinstate 127 hours of Annual Leave and 406 hours of Sick Leave.

(*Id.* at 16.)

On September 4, 2023, Plaintiff's EEO Complaint was denied by Final Agency Decision. (*Id.* at 2–3.) Plaintiff subsequently filed the present action on December 6, 2023. (Doc. 1.)

///

///

///

- 16 -

### III.    Standard of Review

The Court grants summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show[] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(a), (c)). An issue is genuine when a reasonable jury could resolve the disputed facts in favor of either party. *See Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250–51 (1986)). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Under Federal Rule of Civil Procedure 56:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support that assertion by:
>
> > (A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations[,]   .   .   . admissions, interrogatory answers, or other materials; or
> >
> > (B)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)–(B).

The burden then shifts to the non-movant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586–87. The non-movant's bare assertions, standing alone, are insufficient to create

- 17 -

a material issue of fact and defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247–48. Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The Court's role at the summary judgment stage is to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249–50. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

On cross motions for summary judgment, the Court "review[s] each motion . . . separately, giving the nonmoving party for each motion the benefit of all reasonable inferences." *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 167 (2017). The Court may consider either party's evidence in the opposing party's motion when deciding whether to grant either summary judgment motion. *See Fair Hous. Council v. Riverside Two,* 249 F.3d 1132, 1136–37 (9th Cir. 2001).

## IV.   Cross Motions for Summary Judgment

### a.  Count One: Disability Discrimination

The Court finds that there is no genuine dispute of material fact, and Defendant is entitled to judgment as a matter of law, as to Count One. The Court applies the two-step framework from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) to discrimination claims under the Rehabilitation Act. *Mattioda v. Nelson*, 98 F.4th 1164, 1178 (9th Cir. 2024). "Under this framework, a plaintiff must make a prima facie case establishing that (1) he is a person with a disability; (2) otherwise qualified for employment; and (3) suffered discrimination because of his disability."[11] *Id.* Upon this

---

[11] For purposes of this motion, Defendant does not contest that Plaintiff can satisfy the first element of a prima facie case by showing that he is disabled. (Doc. 50 at 12 n.1.)

prima facie showing, the burden shifts to the employer to establish legitimate, non-discriminatory reasons for the challenged adverse action. *Id.* (citing *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005)). The burden then shifts back to the plaintiff to demonstrate that the employer's alleged reasons were merely a pretext for discrimination. *Id.*

### 1.  Qualified Individual

A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Cummings v. DeJoy*, 700 F. Supp. 3d 801, 805 (D. Ariz. 2023); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012). "Essential functions are the fundamental duties of the relevant position." *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1175 (9th Cir. 1998).

There appears to be a genuine factual dispute that Plaintiff was a qualified individual, which turns on whether Plaintiff could have performed all the essential functions of Assistant Lodging Manager by teleworking. The official job description conflicts with Plaintiff's explanation of his duties. Specifically, while the job description outlines primarily administrative duties, Plaintiff described daily inspections, overseeing and escorting contractors on site, and other in-person tasks. Moreover, Plaintiff proffered Huddleston's finding that Plaintiff could have performed the functions of Assistant Lodging Manager remotely. It is, therefore, in dispute to what extent Assistant Lodging Manager requires functions that could only be performed in person.

### 2.  Causation

Nevertheless, the Court finds that summary judgment is warranted because, assuming without deciding that Plaintiff was a qualified individual, he has not shown that he suffered discrimination because of his disability.

The Rehabilitation Act requires strict but for causation. *Chadwick v. Universidad Interamericana de Puerto Rico Inc.*, No. CV-18-00377-TUC-RM, 2018 WL 4492286, at *4 (D. Ariz. Sept. 19, 2018). Therefore, the plaintiff must show that he suffered an adverse

action "'solely by reason of' [his] disability." *Id.* (quoting *Martin v. Cal. Dep't of Veterans Affairs*, 560 F.3d 1042, 1049 (9th Cir. 2009)). The Court is mindful that "[w]hile a private plaintiff must show intentional discrimination under the statutes modeled after Title VI, [the Ninth Circuit] interpret[s] this requirement 'somewhat more broadly' for Rehabilitation Act claims in light of that statute's purpose." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 954 (9th Cir. 2020) (quoting *Mark H. v. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008)).[12] With the Rehabilitation Act, Congress observed that disability discrimination is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference." *Id.* at 954 n.5 (quoting *Alexander v. Choate*, 469 U.S. 287, 295 (1985)).

Plaintiff conflates the causation element of his discrimination claim in Count One with his claim in Count Two that Defendant failed to accommodate his disability. His theory of causation is that Defendant knew about his disability but did not initiate the interactive accommodation process. (Doc. 56 at 8–10.)

The party from whom an accommodation is sought has an affirmative obligation to engage in an "interactive process" triggered by notice of disability and desire for accommodation. *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (discussing the mandatory interactive process in the employment discrimination context); *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112–14 (9th Cir. 2000), *vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) ("The interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation . . . .").

Plaintiff identifies two distinct time periods during which he asserts Defendant was required to engage in the interactive process and failed to do so. The first of these begins on January 6, 2020 when Plaintiff presented his initial doctor's note requiring him to leave work early due to his UC. (Doc. 56 at 11.) Plaintiff contends that this note triggered

---

[12] The Court notes, however, that Plaintiff "must prove a mens rea of 'intentional discrimination' . . . by showing 'deliberate indifference' [or] 'discriminatory animus'" to recover monetary damages. *Schmitt*, 965 F.3d at 954 (quoting *Lemahieu*, 513 F.3d at 938).

Defendant's duty to consider reasonable accommodations. (*Id.*) Plaintiff later asserts that he "clearly notified Defendant of his need for accommodation after the COVID-19 pandemic started" when, on April 9, 2020, Plaintiff submitted a third doctor's note stating "[i]t may be prudent for him to take some time off work to decrease his risk of COVID-19 exposure" because his immune system was compromised due to his disability. (*Id.* at 16.)

Plaintiff fails to establish a genuine dispute regarding causation. First, there is no standalone claim for failing to engage in the interactive process itself—discrimination results only from denying an available and reasonable accommodation. *Gipaya v. Dept. of Air Force*, 345 F. Supp. 3d 1286, 1299 (D. Haw. 2018) (quoting *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018)).

Second, Plaintiff alleges discrimination during two periods for which he did not seek relief. Plaintiff never sought to convert the leave used from January 6, 2020 to April 8, 2020. Nor did he ever seek to convert the leave used from April 9, 2020 to September 6, 2020. As the Court previously emphasized, Plaintiff only seeks to convert the 533 hours used from September 6, 2020 to March 19, 2021.

Third, Plaintiff's focus is misplaced. He identifies the adverse action underlying his discrimination claim as Defendant's "denial of leave reinstatement and conversion."[13] (Doc. 56 at 8.) In other words, Count One arises out of Defendant's refusal to *retroactively* convert Plaintiff's used leave. Yet, in his briefings, Plaintiff focuses on a different adverse action—Defendant's failure to *proactively* initiate the interactive process or to offer him the accommodation of either telework or full time WSL. For example, Plaintiff cites the DOD matrix prescribing telework or WSL. But this matrix—to the extent it was applicable, comprehensive, and binding—guides prospective action, not a request to retroactively

---

[13] For purposes of summary judgment, Defendants do not challenge that the denial of Plaintiff's leave conversion request constitutes an adverse employment action. *Marrazzo v. Leavitt*, 719 F. Supp. 2d 1297, 1309 (D. Or. 2010) ("For purposes of a disability discrimination claim [under the Rehabilitation Act], an adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'" (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008))).

- 21 -

convert leave.[14]

The proper question before the Court is whether Plaintiff has put forth specific facts showing there is a genuine dispute that Defendant discriminated against him solely because of his disability when it denied Plaintiff's request to convert and reinstate his leave. The Court finds that Plaintiff has not.

Plaintiff names four non-disabled employees who received full time WSL when they contracted COVID-19, arguing that Defendant treated him less favorably. (*Id.* at 9–10.) This argument is a red herring. The situations are not comparable because Plaintiff never contracted COVID-19. The argument is also irrelevant to the challenged adverse action because none of the alleged comparators ever requested to retroactively convert their leave.[15]

Plaintiff also cites the recommendation from Huddleston that Defendant reinstate Plaintiff's leave. The Court is unclear why Plaintiff asserts that memorandum is evidence of discrimination. Huddleston did not conclude or even suggest that Defendant denied Plaintiff's request because of his disability. She merely reasoned that Baker failed to adhere to procedure when he executed leave forms without Plaintiff's signature, rather than marking him AWOL. As the Court previously observed, a supervisor's failure to follow policy does not automatically default to discrimination.

In short, Plaintiff has not presented any evidence that, but for his disability, Defendant would have retroactively converted his leave. Indeed, he neither alleges that

[14] Moreover, even if a reasonable jury could conclude that Baker did not follow the newly issued pandemic leave guidelines, there is nothing to suggest Baker "forced [Plaintiff] to deplete his sick and annual leave" solely because of his disability. (Doc. 56 at 8–9.) The Court recognizes that Baker may have violated policy by executing leave forms on Plaintiff's behalf; however, those efforts could not reasonably be found to be discriminatory considering the alternative would have been that Plaintiff would have been AWOL due to his own lapse in adherence to policy. In other words, for better or worse, Baker appears to have been attempting to help Plaintiff by submitting his leave slips on his behalf after Plaintiff abandoned even the most basic of his job responsibilities.

[15] Plaintiff argues that an adverse inference should apply because Defendant allegedly withheld OPM71s for the named comparators. (Doc. 56 at 13.) The Court disagrees. The OPM71s for the named comparators are irrelevant for the reasons stated above.

- 22 -

Defendant's denial was based on discriminatory animus nor offers support that it was a result, more broadly, of "thoughtlessness and indifference." *Schmitt*, 965 F.3d at 954 n.5. Plaintiff's bare assertions, standing alone, are not sufficient to create a genuine dispute of material fact to defeat summary judgment. *Anderson*, 477 U.S. at 247–48.

Similarly, to the extent any such analysis is necessary, there is no evidence that shows that Defendant refused to proactively offer Plaintiff telework or full time WSL solely because of his disability. On the contrary, Defendant had in place an accommodation at Plaintiff's request that Plaintiff work a reduced schedule for medical reasons. Plaintiff never withdrew that accommodation request by informing his employer he was now medically cleared to work full time. Absent such information, even under a broad but-for analysis, no reasonable jury could find that Defendant discriminated against Plaintiff when it did not assume that Plaintiff could work a full 8-hour day and offer means to accommodate that.[16] The Court, therefore, finds that Defendant is entitled to summary judgment as to Count One.

### 3. Pretext

Assuming arguendo that Plaintiff established his prima facie case, he nonetheless fails to present any disputed facts showing that Defendant's actions were a pretext for discrimination. To show pretext, Plaintiff must show that his employer's proffered explanation was unworthy of credence or that unlawful discrimination more likely motivated the employer. *Lyons v. England*, 307 F.3d 1092, 1113 (9th Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). The evidence must be specific and substantial. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994)).

Plaintiff argues that "Defendant unilaterally imposed a pre-pandemic leave distribution formula . . . without individualized consideration" and "deviated from established leave policies by charging Plaintiff with sick and annual leave for periods when

---

[16] The Court notes that the fact that Plaintiff returned for one full day on March 24, 2021 does not change this analysis because the dates relevant to the alleged discrimination are September 6, 2020 to March 19, 2021.

- 23 -

it did not receive Plaintiff's OPM 71s." (Doc. 56 at 11.) This is neither specific nor substantial evidence of pretext.

When Plaintiff inexplicably stopped submitting leave forms, Defendant replicated a pattern of use of AL and SL that Plaintiff had personally requested before *and after* the start of the pandemic. The fact that Baker did not comply with policy when he submitted these forms without Plaintiff's signature is not evidence by itself of discrimination. As the Court previously observed, the alternative would have been to designate Plaintiff as AWOL making him subject to disciplinary action.

Accordingly, even if Plaintiff had come forth with evidence showing a genuine dispute as to his prima facie case, he fails to show any proof of pretext that would survive summary judgment. Therefore, the Court's finding that Defendant is entitled to summary judgment as to Count One stands.

### b.  Count Two: Failure to Accommodate

The Court further finds that Defendant is entitled to summary judgment as to Count Two of Plaintiff's Amended Complaint.

### 1.  Administrative Exhaustion

As a threshold matter, Plaintiff is required to exhaust his administrative remedies before filing a Rehabilitation Act claim in federal court. *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994); *Simpson v. DeJoy*, No. CV-20-00495-PHX-DWL, 2021 WL 2416831, at *4 (D. Ariz. June 14, 2021) (citing *Cherosky v. Henderson*, 330 F.3d 1243, 1245 (9th Cir. 2003)). To do so, he must notify an Equal Employment Opportunity ("EEO") counselor within 45 days of the alleged discriminatory conduct, and, if the matter is not informally resolved, the employee may file a formal administrative complaint. 29 C.F.R. § 1614.105(a); *Sommatino v. United States*, 255 F.3d 704, 708 (9th Cir. 2001)). "The jurisdictional scope of the plaintiff's court action depends on the scope of the EEOC charge and investigation." *Leong v. Potter*, 347 F.3d 1117, 1122 (9th Cir. 2003). Ordinarily, a court only has jurisdiction over claims that were presented to the EEOC. *Id.* "However, the district court has jurisdiction over any charges of discrimination that are

'like or reasonably related to' the allegations made before the EEOC, as well as charges that are within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations." *Id.* (quoting *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990)).

The Court "construe[s] charges filed before the EEOC . . . liberally." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1061 (9th Cir. 2006). Nonetheless, "there is a limit to such judicial tolerance when principles of notice and fair play are involved." *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) (citation and internal quotation marks omitted). Accordingly, "[t]he rule of liberal construction does not suggest that a plaintiff sufficiently exhausts his administrative remedies under Title VII by merely mentioning the word 'discrimination' in his or her EEOC administrative charge." *Id.* at 637. Rather, the relevant focus is on "the factual allegations made in the charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Id.*

In determining whether Plaintiff has exhausted allegations that he did not specify in his administrative complaint, the Court considers: (1) the "alleged basis of the discrimination;" (2) "dates of discriminatory acts specified in the charge;" (3) "perpetrators of discrimination named in the charge;" and (4) "any locations at which discrimination is alleged to have occurred." *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1100 (citation omitted), *abrogated on other grounds by Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541 (2019).

Here, Plaintiff did not exhaust his administrative remedies before filing Count Two of his Amended Complaint. Plaintiff did not include any allegation that Defendant failed to accommodate his disability in either his Informal EEO Complaint or his Formal EEO Complaint. Instead, Plaintiff repeatedly noticed the following claim:

> Whether the complainant, Mr. David Ruiz[,] was discriminated against based on disability, Chronic Ultracolitis [sic] (physical) when on 2 November 2022, Mr. Dan Baker, Lodging Manager, 355 FSS/FSVL, did not reinstate 127 hours of Annual Leave and 406 hours of Sick Leave.

(Doc. 51-26 at 12, 16.) Throughout the administrative remedies process, Plaintiff specifically identified the challenged action as Defendant's discrimination in refusing to convert and reinstate his leave.

Moreover, Plaintiff's unnoticed claim that Defendant did not accommodate his disability is not like or reasonably related to his noticed discrimination claim. The noticed claim centers on different actions and a different timeline. Specifically, Defendant would have only known that Plaintiff challenged its action refusing to retroactively convert his leave in November 2022. This is nearly two years after Defendant allegedly failed to accommodate Plaintiff's disability in 2020 and 2021. Even construed liberally, nothing in Plaintiff's Informal EEO Complaint or his Formal EEO Complaint would have put Defendant on notice that Plaintiff intended to assert a failure to accommodate claim. To find otherwise would run afoul of the principle of fair play.

Finally, even if Plaintiff's failure to accommodate claim were sufficiently related to his discrimination claim, Plaintiff did not contact an EEO counselor until November 16, 2022. Any claims based on actions prior to approximately October 1, 2022 fall outside of the 45-day reporting deadline. Plaintiff argues that Defendant failed to accommodate him after learning about his disability on January 6, 2020 and after being notified that Plaintiff needed to take time off of work due to COVID-19 on April 9, 2020. (*See* Doc. 56 at 11, 16.) Both these triggering events occurred more than 45 days before Plaintiff ever contacted an EEO counselor. "[A]bsent wavier, estoppel, or equitable tolling, 'failure to comply with this regulation is . . . fatal to a federal employee's discrimination claim' in federal court." *Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1043 (9th Cir. 2009) (quoting *Lyons*, 307 F.3d at 1105); *see also Gipaya*, 345 F. Supp. 3d at 1296 ("To the extent Plaintiff asserts claims for failure to reasonably accommodate his disability based on these incidents, those fail to state plausible claims for relief because Plaintiff fails to allege he contacted an EEO counselor within forty-five days of the respective incidents. Those claims must therefore be dismissed."). Plaintiff has not argued waiver, estoppel, or equitable tolling. Therefore, allowing his claim to proceed would improperly invalidate the regulatory reporting requirement.

For these reasons, the Court finds that Defendant is entitled to summary judgment on Count Two because Plaintiff did not exhaust his claim that Defendant failed to reasonably accommodate his disability.

### 2. Merits

In an abundance of caution, the Court will nonetheless assess the merits of Plaintiff's failure to accommodate claim.

Plaintiff did not specify what accommodation he believes Defendant failed to provide at Plaintiff's request. The only denied accommodation that falls within the 45-day period before Plaintiff contacted an EEO counselor was Defendant's refusal to convert and reinstate his leave. That claim fails because an accommodation cannot be retroactive. *Chandler v. DeJoy*, No. CV-20-00924-PHX-DWL, 2024 WL 359469, at *14 (D. Ariz. Jan. 31, 2024) ("Since reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability." (quoting U.S. Equal Employment Opportunity Comm'n, No. 915.002, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act 36 (2002))); *see also Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 65 (1st Cir. 2020) ("Even though reasonableness necessarily depends on the circumstances of a given case, some general principles apply. For instance, a requested accommodation that simply excuses past misconduct is unreasonable as a matter of law. After all, the ADA does not oblige an employer to accommodate an employee's disability retroactively.").

However, Plaintiff seems to argue that Defendant should have offered him the accommodation of telework. If Plaintiff had noticed this claim—which he did not—and if it fell within the 45-day notice period—which it does not—Plaintiff still cannot show a genuine dispute of material fact exists that Defendant received adequate notice of his need to telework.

A failure to accommodate claim requires the plaintiff to show (1) he was a qualified individual, (2) the employer received adequate notice of the need for an accommodation, and (3) a reasonable accommodation was available that would not place an undue hardship on the employer's business. *Snapp*, 889 F.3d at 1095. "[N]otifying an employer of a need

for an accommodation triggers a duty to engage in an 'interactive process[.]'" *Id.* However, "[t]he employer's duty to provide an accommodation is not triggered unless the employee 'provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability *and desire for an accommodation*.'" *Marquez v. Glendale Union High Sch. Dist.*, No. CV-16-03351-PHX-JAT, 2018 WL 4899603, at \*19 (D. Ariz. Oct. 9, 2018) (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)) (emphasis added).

For purposes of this analysis, the Court will presume that there is a genuine dispute as to whether Plaintiff was a qualified individual. *See supra* Section IV(a)(1). However, Plaintiff has not shown a dispute regarding the second element of his claim. Although Defendant knew about Plaintiff's disability, Plaintiff never told Defendant he needed any accommodation other than to leave work early or not come to work at all.

Prior to the pandemic, Plaintiff submitted two doctor's notes that required Plaintiff to leave work early. There was no mention that Plaintiff sought to complete his hours from home, or even that he was medically able to do so. Then, from March 2020 to February 2021, Plaintiff submitted four notes from his doctor stating that Plaintiff needed to take time *off work* due to the pandemic. Again, there was no mention that Plaintiff was medically able to work from home, let alone any suggestion that Plaintiff desired the option to telework. The only accommodation that Plaintiff asked for was the accommodation he repeatedly received—to leave work early or take an extended absence.

It was not until the note dated February 2, 2021 that Defendant could arguably have received any notice of the need for a different accommodation. Plaintiff's doctor stated he was "medical qualified – if restrictions [were] accommodated" including "allow[ing] [Plaintiff] *to work from home* to avoid exposure to Covid." (Doc. 51-10 at 46 (emphasis added).) At this time, Defendant did not engage in discussions with Plaintiff about teleworking, but shortly thereafter, on March 29, 2021, Plaintiff submitted another note again stating he was not permitted to return to work at all until May 3, 2021. (*Id.* at 56.) That note did not indicate Plaintiff would be able to work from home nor that he wanted to. Thus, Plaintiff fails to present sufficient disputed facts that create a triable issue

regarding the second element of his failure to accommodate claim. The Court need not assess the third element of whether Plaintiff's accommodation presents an undue hardship to Defendant. Accordingly, Defendant is entitled to summary judgment as to Count Two.

**V.      Conclusion**

For the foregoing reasons, the Court finds that summary judgment in favor of Defendant on Plaintiff's Amended Complaint is appropriate. The pleadings and supporting documents, even viewed in the light most favorable to Plaintiff, "show[] that there is no genuine issue as to any material fact and [Defendant] is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322 (quoting Fed. R. Civ. P. 56(a), (c)).

Accordingly,

**IT IS ORDERED**:

(1)      Defendant's Motion for Summary Judgment is **GRANTED**. (Doc. 50.)

(2)      Plaintiff's Motion for Partial Summary Judgment is **DENIED**. (Doc. 52.)

(3)      The Clerk of Court shall enter judgment in favor of Defendant and close the file in this matter.

Dated this 31st day of March, 2026.

Honorable Angela M. Martinez
United States District Judge